DAVIDOFF HUTCHER & CITRON LLP
*Attorneys for David & Karen Acker*
120 Bloomingdale Road
White Plains, New York 10605
(914) 381-7400
Robert L. Rattet, Esq.
Jonathan S. Pasternak, Esq.

*Hearing Date: March 7, 2023*
*Hearing Time: 10:00 a.m.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
In re:

MARK STEVEN ACKER,                                    Chapter 11
                                                      Case No. 22-22359 (SHL)

                 Debtor.
------------------------------------------------------------------X

**RENEWED MOTION BY DAVID & KAREN ACKER FOR AN ORDER
CONVERTING THE DEBTOR'S CHAPTER 11 BANKRUPTCY CASE TO A CASE
UNDER CHAPTER 7 OF THE BANKRUPTCY CODE**

**TO THE HONORABLE SEAN H. LANE,
UNITED STATES BANKRUPTCY JUDGE:**

       David and Karen Acker (the "Movants"), by their attorneys, Davidoff Hutcher & Citron

LLP, as and for their renewed motion, pursuant to 11 U.S.C. § 1112(b) of the Bankruptcy Code,

hereby move for entry of an order converting the Chapter 11 Case of Mark Steven Acker (the

"Debtor") to a case under Chapter 7 (the "Motion").

## I. INTRODUCTION

       1.     Since the filing of the initial Motion to Convert (ECF Doc. 18), the Debtor's

situation has materially worsened. The Debtor is now hopelessly and  administratively insolvent.

The Debtor has lost his counsel to protect his bankrupt estate's interest in his father's trusts and

estate. As the estate continues to erode, the Debtor has made no progress in liquidating his only

known material non-exempt asset, the 47 Property. More disturbing, the Debtor removed the

1

property from its listing in November yet still has not produced an offer or contract; leaving the sale of the property in limbo for months, while the Movant's continue to accrue statutory judgment interest in the property, eroding all of its remaining value for other creditors. The Debtor has not investigated multiple known and suspected transfers and related causes of action due to his conflict with the insiders who were the recipients of such voidable transfers. Movants now fear that the Debtor used settlement negotiations in which the Movants invested in significantly simply to further obfuscate, stall and delay creditors and the exercise of their rights, including the making of this renewed Motion. Simply put, the Debtor is not able to act as a fiduciary for creditors.

2. Moreover the Debtor cannot confirm a plan. His known assets are not of near enough value to even cover Movants' $1 million judgment today, let alone their other approximate $1.7 million in unsecured claims or the other approximate $250,000 in unsecured claims in his estate. There are no other classes of creditors whose claims could be impaired under a plan for purposes of obtaining confirmation. The Debtor is hopelessly conflicted from pursuing estate causes of action against his family members. Without prosecuting and recovering such avoidable transfers, it is impossible for the Debtor to propose, let alone confirm, a 100% plan. A Debtor "placeholder" plan would therefore be futile and meaningless. As a result, the Debtor cannot propose a plan either in good faith or one that is either feasible or in the best interest of creditors.

3. Finally, the Debtor has already had more than seven months to resolve the issues that plague his bankruptcy. Not only has the Debtor utterly failed to accomplish anything in his case, but he has also failed to timely file operating reports, failed to account for his financial affairs or transfers of property (despite having numerous opportunities to remedy the material inaccuracies, deficiencies and omissions of his testimony given at the 341A meeting) and has now

jeopardized the estate by failing to maintain counsel in Florida or timely sell the 47 Tranquility Property.

4. The Debtor has been given more than a reasonable opportunity to confirm a plan. He has utterly failed to do so, to the direct and material detriment and harm of his creditors. Movants therefore renew their motion seeking the immediate conversion of this case to Chapter 7 so that an independent, disinterested fiduciary can effectively administer the Debtor's estate and maximize the return to all creditors.

## II. JURISDICTION AND VENUE

5. The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is 11 U.S.C. § 1112(b).

## III. BACKGROUND

6. The Movants are siblings to the Debtor and due to conduct attributable to the Debtor, have been embroiled in vexatious and at times spurious litigation, related to their father's estate, the Estate of Stanley Acker (the "Estate") and the Matter of the Irrevocable Life Insurance Trust, Stanley Acker, Grantor dated October 1, 1987 (the "1987 Trust"). Both matters are still pending in Palm Beach County, Florida. The Debtor has already been found to have committed tortious acts and breached his duties in his capacity as a fiduciary in both cases.

7. Throughout the administration of the Estate, the Debtor fought with the Movants extensively, in breach of his fiduciary duties, causing numerous and duplicative litigation and legal fees that plagued and sapped the administration of the Estate, despite previously agreeing to a valid and enforceable settlement agreement to resolve these issues (the "2010 SA"). Over the course of

the trial, multiple witnesses testified, including the parties, previous estate counsel, previous court appointed co-personal representative/fiduciary Kirk Friedland, and New York and Florida counsel.

8. The 2010 SA was entered into by the parties on November 16, 2010, approved by order of the Florida Court, and is a binding contract under Florida law, entered into by the parties willingly, knowingly, and voluntarily. A copy of the 2010 SA is annexed hereto as Exhibit "A".

9. The 2010 SA specifically provides that the parties "have fully discussed this agreement with their attorneys with respect to the meaning and effect of the provisions of this agreement and have voluntarily chosen to sign this agreement, fully understand its content, meaning, legal effect and consequences, free of any duress or coercion."

10. Ultimately, on February 2020 the Florida Court issued a final Judgment (the "Judgment") against the debtor annexed hereto as Exhibit "B", finding inter alia, the Debtor was in material breach of the 2010 SA. The Judgment specifically supported the expert witness. The Court specifically found:

> "Mr. Forman's testimony is credible. Pursuant to 733.901(2), Florida Statues, the instant actions filed by KA and DA (Petitioners) are not barred by any statute of limitations. MA's (Debtor's) testimony was not credible and from his actions it is clear he did not adhere to Florida law regarding personal representatives and trustees. Furthermore he failed to abide by multiple terms of the 2010 SA (Settlement Agreement) by taking actions including but not limited to:
>
> a) *Interference with the IRS and Audit, including but not limited to seeking to have a higher tax burden imposed upon the Estate, which led to the imposition of significant additional and unnecessary legal and other professional fees upon the Estate;*
>
> b) *MA's interference in the Accounting Proceeding;*
>
> c) *Repeatedly attempting to unilaterally remove the court appointed fiduciary;*

*d)  Objecting to, and/or blocking payment of administrative expenses, including professional fees incurred in connection with the administration of the Estate;*

*e)  Refusal to abide by the terms of the 2010 SA requiring that all future accounting be waived;*

*f)  Contacting the IRS and making false allegations of a conspiracy;*

*g)  Failing to abide by the duties imposed upon fiduciaries, such as MA, duties to (i) carry out the decedent's intent; (ii) to administer and close the estate in the most efficient manner possible; (iii) to respect and abide, and not hinder, the majority decisions made by his co- fiduciaries; and (iv) to act, at all times, in the best interests of the Estate; and*

*h)  By acting in his own personal interests instead of acting in the best interests of the Estate."*

11.     The Judgment also found that "Plaintiffs' expert witness, Peter Forman, Esq, who has over 30 years of probate experience, testified credibly that the Debtor's behavior toward the Estate was "pure animus", in violation of Florida Law, and probate rules...." Debtor's misconduct has not only been found in Florida but also in New York where he continued filing lawsuits against Plaintiffs and wherein the Honorable Judge Thomas E Walsh, II New York State Supreme Court, by Order dated December 15, 2014 stated: "Nonetheless, [Plaintiffs] have made out a compelling case that [Debtor] is motivated by animus, and that he is willing to sacrifice a reasonable sale price to spite his siblings."

12.    In the Judgment, the Florida Court awarded, inter alia, the following damages in favor of the Plaintiffs and against the Debtor, which are to be surcharged from the Debtor's share of the Estate or Martial Trust, or otherwise imposed against him personally:

a. Tannenbaum Halpern attorneys' fees related to the Accounting Action, as testified to by expert Peter Forman, Esq.: $362,500.00;
b. Proskauer Rose attorneys' fees not related to the Declaratory Action as testified to by expert Peter Forman, Esq., Jonathan Galler, and Karen Acker: $225,500.00;
c. Proskauer Rose attorneys' fees related to the Declaratory Action, as testified to by expert Peter Forman, Esq.: $254,000.00;
d. Gutter Chavez attorneys' fees, as testified to by expert Peter Forman, Esq.: $58,000.00; and
e. Additional fees incurred in the Marital Trust action since trial began in March 2019, as testified to by Karen Acker: $60,000.00;

TOTAL: $960,000

13.    By virtue of the court's findings in support of the Judgment, the Ackers believe the Judgment is nondischargeable within the meaning of Section 523(a)(4) of the Bankruptcy Code.

14.    In addition to the Judgment, the Movants have additional claims against the Debtor (all of which have been filed in this proceeding) including:

a. The valuation of the Debtor's interest in the Stanley Acker Estate– The Debtor is a one third beneficiary of anything left in the Estate after the Movants finish the ongoing litigation and administration of the Estate[1]. Currently, the Estate has approximately $1,300,000. Moreover, the Movants [are in the process of] filing a motion approving terms of the 2010 SA that sets forth that i) given "the ultimate resolution of the [then] pending IRS audit ... required the Estate to pay less than $4,054,977" and ii) given the fact that the Estate ultimately paid $459,883.00 for

---

[1] As the Court is aware the automatic stay has been lifted to permit the full and complete litigation of all matters related to the Estate. As a result, the Bankruptcy Court will not be needed to adjudicate any of Movant's claims against the Debtor the Chapter 11 case.

resolution of the said IRS audit, then the difference between these two amounts (or $3,595,094.00) shall be divided so that Karen Acker and David Acker receive 90% (or $3,235,584.60) and Mark Acker shall receive 10% (or $359,509.40). Based on the Estate only having approximately $1,300,000.00 the Debtor's share at 10% would be approximately $130,000.00

b. The 1987 Trust litigation – In 2019 the Debtor was removed as the sole trustee for breach of his fiduciary duty and other misappropriations of money. There are several orders from the Court awarding Movants with legal fees against the Debtor. Hearings regarding this litigation are [in process]. The Movants' attorney anticipates that Movants' potential claim amount against the Debtor could be in amount in excess of $300,000-400,000 (including Movants' attorney's fees and costs).[2]

c. Estate of Stanley Acker – Movants won attorneys fees against the Debtor related to the Judgment that is final. This amount is estimated to be approximately $650,000.00 and hearings in Florida are already in place to address the award to be ordered by the Florida Court.[3]

d. Bluegate LLC - This was an entity owned by the Movants and the Debtor. The Debtor has refused to pay expenses regarding management of this entity and owes Movant Karen Acker an estimated $6,462.65.

---

[2] Curiously, the Debtor's current motion to dismiss this bankruptcy does not identify any amount owed by Debtor for this matter.
[3] Curiously, the Debtor's current motion to dismiss this bankruptcy does not identify any amount owed by Debtor for this matter.

e. KMD Management – This was also an entity owned by the Movants and the Debtor. The Debtor has refused to pay his one third share of the costs of this entity, and owes Movant Karen Acker an estimated amount of $19,200.00.

15. The Debtor appealed the Judgment, and said appeal was denied on January 27, 2022, making the Judgment final.

16. On March 18, 2022, the Movants entered the Judgment at the Rockland County Clerk's Office.

17. The Debtor commenced this case by filing a petition under Chapter 11 of the Bankruptcy Code on June 15, 2022 (the "Petition Date").

18. On July 13, 2022, the Debtor filed his schedules ("Schedules") and statement of financial affairs ("SOFA") after a request for an extension of time to file on June 28, 2022. A copy of the Debtor's petition and schedules as filed are annexed hereto as Exhibit "C".

19. Despite the granted extension of time to file Schedules and SOFA, and now seven months to make amendments or corrections, these sworn pleadings are still rife with inaccuracies and omissions. In view of the presence of competent, well-regarded bankruptcy counsel, these misstatements must be regarded as deliberate or at the least wantonly reckless.

20. From an analysis of the Debtor's petition and schedules it is initially apparent that there are numerous assets and interests in property the Debtor did not include, whether intentional or not. Such inconsistencies and omissions in the Debtor's petition and schedules include:

a. The Stanley Acker Intervivos Trust - While the Debtor did list an interest in this trust that encompasses the Stanley Acker Estate, he did not identify a value, specifying an unknown amount. In fact, the Debtor receives and for years has received bank statements for this Trust and Estate, so his lack of disclosure is not

forthcoming. As mentioned above, this Trust has approximately $1,300,000 that although the Debtor is a one-third beneficiary, the distribution of this asset is still in litigation.

b.  The Marital Trust – There is no mention anywhere in the petition or schedules of the Debtor's interest in the Stanley Acker Marital Trust, which the Debtor also receives statements and has for years, yet claims Movants control it and he has no information. This trust was set up in the Stanley Acker Revocable Intervivos Trust by the Debtor's late father for the lifetime benefit of his wife Arlene Acker, and contains roughly $3,900,000.00 in assets to be divided in equal one-third shares between the Debtor and the Movants upon Arlene's death[4].

c.  The 1987 Trust – There is no mention in the Debtor's initial SOFA of the Debtor's one third beneficiary interest in the 1987 Trust, of which the Movants are also one third beneficiaries. The Debtor was the sole trustee of the 1987 Trust until he was removed by the Florida Courts, who twice found that the Debtor breached his fiduciary duties. The court appointed an outside trustee to continue to manage, and upon information and belief, the Movants believe there is approximately $80,000 in the bank account of which all three beneficiaries have an equal one third share interest. The Debtor did not declare this either as an entity he has an interest in, nor did he even attempt to identify this as an unknown potential value. The Debtor claimed in the 341 meeting that the Movants manipulated the numbers of this trust

---

[4] Curiously however, notwithstanding the glaring omission in the petition, Debtor has chosen to disclose his interest, as a remainder beneficiary in the Marital Trust, in his concurrently filed motion to dismiss the bankruptcy proceeding in this Court.  While Debtor has done so now in a transparent effort to fortify grounds warranting dismissal, the failure to do so in the Petition is rendered all the more glaring as to Debtor's knowledge and original affirmative failure to disclose when the proceeding was commenced.

which is ridiculous since he was the sole trustee of this trust until removed by the court and replaced with another trustee appointed by the court. However, *Movants do not have and never had any control of this trust or its assets!*[5] There is also ongoing litigation related to this trust, that as mentioned above will likely result in a judgment against the Debtor for approximately $300,000.00 to $400,000.00.

d.  The Stanley Acker Family Limited Partnership ("SA FLP") – There is no mention in the Debtor's SOFA of the Debtor's interest in this partnership or, of which the Movants are also partners. The Movants can represent that the Debtor received a total distribution in July 2021 of $530,000 plus in October of 2020, an additional $50,000. The Debtor's total disbursement received within the last two years is estimated to be $580,000. The Debtor also received a distribution of $500,000 in 2014 from other assets that the partnership sold. The Debtor did not disclose any of these distributions in his SOFA, or otherwise satisfactorily account for such distributions.

e.  Orchard Lane Property - Another asset the Debtor did not disclose in his SOFA was his interest and sale of real estate at 3 Orchard Lane, Congers, New York 10920. To resolve some intensive litigation and save cost further litigating, the Movants settled with the Debtor in June of 2019 to help resolve some estate and SA FLP matters and agreed to have the Estate transfer a piece of this real estate to the Debtor. Upon information and belief, the Debtor sold it (to the same buyer the Movants sold the SA FLP properties to) in January 2021 for $355,000. In light of

---

[5] The Debtor, in its recent "knee jerk" motion to dismiss the case, tries again to blame all his liabilities on Movants with "fake news" and falsified facts. The Debtor continues to demonstrate his lack of integrity and trustworthiness.

this, and the other transfers, there is no satisfactory account of the insufficiency of assets to meet liabilities.

f.  The Shirley Acker Irrevocable Trust– The Debtor's interest in this trust, created by the late mother of the Debtor and the Movants, was also omitted by the Debtor from the Schedules and SOFA. The Movants have closed this trust and have proposed to the Debtor to release its remaining funds and divide them equally. However, the Debtor has still not agreed to sign the release of funds, and as such approximately $3,000.00 is still pending release to Debtor.

g.  The 1993 Trust – The Debtor and the Movants' late father had another insurance trust called the 1993 Trust, funded by insurance policies. Their father provided $100,000 each to go to the Debtor's three children and David Acker's one child. Then their father wanted his brother, their uncle Robert Acker, to receive $100,000, but due to a funding issue related to the trust, the language of the trust affected such a distribution. Karen Acker undertook with David Acker and the Debtor who all agreed to make their uncle whole. The Movants did so right away, and the Debtor signed a promissory note of which he is still in default. The Debtor failed to disclose this liability in his schedules and even testified at the 341(a) Meeting that he did not owe this debt.

h.  MSA Consulting Corporation ("MSA") – Although the Debtor included reference to an interest in MSA in his schedules, his attorney proposed an amendment to remove the Debtor from having any ownership interest in MSA. Neither the attorney nor the Debtor disclosed his past sole ownership of this entity, nor did he disclose that he recently added his spouse as an officer of MSA in October 2019,

and he made his spouse the CEO and removed himself as an officer of MSA in December 2019. Nowhere in the Schedules or SOFA is this mentioned, and at the 341 Meeting(a), the Debtor's attorney only identified that she was making an amendment and removing the Debtor as having any ownership of this entity. Upon information and belief the Movants believe this entity may be holding assets or have held assets in recent years.

i.  Omitted Litigation – In the Debtor's SOFA, the Debtor initially failed to include his litigation entitled *Mark Acker And Rochelle Acker V. Goosetown Enterprises, Inc., Harley-Davidson Inc., Harley-Davidson Motor Company, Inc., Harley-Davidson Motor Company Group, LLC, and H-D U.S.A., LLC*, pending in Supreme Court, Rockland County, Index No. 030868/2021, pertaining to his accident where he alleges product liability against Harley Davidson in their manufacturing of his motorcycle. At the 341(a) Meeting, the Debtor's attorney confirmed this lawsuit existed and proposed to amend the schedules to include it, but she claimed that the attorney representing Mark said it would likely be worth nothing though he intended to continue with it.

j.  IMA Construction Corporation ("IMA") – Upon information and belief, the Movants believe that the Debtor had an interest as an officer or director in IMA, and subsequently transferred his whole interest to his spouse. Upon information and belief, the Debtor and his spouse had been officers for over 20 years until four months after the February, 2020 Judgment against him was ordered. In July 2020, the Debtor removed himself as CEO and an officer of IMA leaving his spouse as sole officer and CEO. Approximately six months later, in 2021, IMA sold its asset

for over $500,000.00. Per the New York Secretary of State's website, the Debtor's spouse Rochelle Acker, became the sole recipient of the sale of the real estate asset in that entity. Nowhere in the Debtor's petition or schedules is any of this mentioned. The value of IMA is not disclosed by the Debtor as his asset, nor if not his asset, the transfer of this asset is not disclosed. At the 341(a) Meeting, the Debtor testified that he did not know when he transferred his interest to his spouse.

k.  Galaxy Fine Arts – Upon information and belief, the Movants believe the Debtor was the owner of this entity, which maintained a collection of Star Trek collectibles worth an estimated $1,500,000. The Debtor has not made any disclosure as to his relationship with this entity, and it is unknown if the collection was sold or what the Debtor's current interest is. At the 341(a) Meeting, the Debtor was not sure of the specifics of these assets.

l.  WWII Collection – Upon information and belief, the Movants believe that on or about October 2019 the Debtor became in possession of a collection of WWII memorabilia worth an estimated $150,000 as valued by the Debtor's friend in 2008. The Debtor failed to disclose this collection, and it is unknown what the current status or disposition of this collection is.

m.  Elleance – Upon information and belief, the Movants believe the Debtor acquired on or about October 2019 valuable jewelry known as Elleance. At the 341(a) Meeting, the Debtor testified that he sold all of this Elleance jewelry to pay bills but cannot recall the specifics of any of these transactions. No mention of any jewelry or transfers of jewelry are mentioned in the Debtor's petition and schedules.

n.  Omitted Automobile – At the 341(a) Meeting, the Debtor testified that he used to own a Porsche 911 within the last 6 years that was sold by his son to pay bills. The Debtor does not recall any more specifics as to this transaction other than selling the car for a price between $40,000 and $45,000, and there is no mention in the petition or schedules of the Debtor's interest in this automobile or its disposition.

o.  Elephant Tusk – While the Debtor does state in his schedules that he is in possession of an elephant tusk, he dubiously lists the value as "unknown". Upon information and belief, the Movants believe this tusk was valued at $60,000.00 per an insurance policy in 2002 and the Debtor previously verbally communicated to the Movants that the tusk may be worth $150,000.00. The Movants find it hard to believe the Debtor is not aware of the value of such an unusual asset despite his long ownership of it, and the previous insurance coverage of it.

21.     On July 20, 2022, the 341(a) Meeting was held. At the 341(a) Meeting the Debtor was unable to explain or account for the assets listed above or their likely disposition, demonstrating the urgent need for the conversion of this Chapter 11 Case. When asked about the various transfers of assets and his current interests in them, the Debtor was barely able to recall a single one. A copy of the transcript from the 341(a) Meeting is annexed hereto as Exhibit "D".

22.     Since the 341A meeting, the Debtor, for now over 6 months, has failed to adequately disclose or account for any of the above assets and/or transfers.

23.     On October 3, 2022, Movants timely filed the following proofs of claim against the

Debtor:

David Acker: $68,543.97 (Claim No. 8);

David & Karen Acker: $2,610,000.00 (Claim No. 9); and

Karen Acker: $28,593.15 (Claim No. 10).

Despite the Debtor's current battle cry that Movants' claims are now somehow disputed, the Debtor never objected to Movants' claims, deeming them allowed under Section 502(a) of the Bankruptcy Code.

24.     Moreover, the Debtor has failed to properly administer his bankrupt estate, causing the administrative insolvency of the estate, jeopardizing the value of the estate's assets and causing further delay and harm to all of his creditors. Cause therefore exists for converting the case pursuant to Bankruptcy Code Section 1112(b)(4)(A) and (B).

25.     As disclosed to the Court by Movants, despite Debtor's prior knowledge, the Debtor no longer has counsel to represents his interests with respect to his late father's trusts and estate in Florida.[6] As the Court may recall, the automatic stay has been lifted by this Court to permit the full and final adjudication of the Debtor's interests in such trusts and estates and the Acker's interests and claims of set off and recoupment against the Debtor.

26.     The Debtor is therefore incapable of protecting or administering his bankrupt estate's interests in such assets, further demonstrating he is incapable of acting as a fiduciary for

---

[6] At a hearing recently held in Florida, Debtor's counsel of record Donna Solomon was permitted to be relieved as counsel, further complicating and delaying the pending proceedings in the Florida State Court and leaving the Debtor without representation. The Debtor failed to disclose this to the Bankruptcy Court until Movants brought it to the Court's attention. Moreover, Ms. Solomon asserts a substantial claim against the Debtor, which the Debtor , without explanation or claim objections, typically refers to as disputed – the way he has classified every single unsecured debt in the Chapter 11 case.

his creditors. Cause therefore exists for conversion of the case pursuant to Bankruptcy Section 1112(b)(4)(B).

27.     The Debtor has continuously failed to timely file monthly operating reports or take any actions to adjudicate claims, investigate or prosecute causes of action or otherwise timely administer this Chapter 11 case. Cause therefore exists for conversion of the case pursuant to Bankruptcy Section 1112(b)(4)(F).

28.     Most disturbingly, Movants informed the Court, after the Debtor's failure to disclose, that the 47 Tranquility Property was taken off multiple listing in November 2022, and no adequate information or explanation has been forthcoming regarding such de-listing (other than Debtor's counsel's remarks that she believes the property has been in contract), leaving the Ackers and other creditors in the dark as to the marketing and sale status of the Debtor's only disclosed significant asset. Such deception leads Movants to believe that the Debtor intentionally withheld information regarding the supposed sale or contract from Movants (and the Court) for purposes of exacting leverage in settlement discussions. Such conduct demonstrates the Debtor's continued lack of trust and good faith in the Chapter 11 case.

29.     As if sufficient cause did not already exist for the immediate appointment of a trustee, the Debtor's case must be converted to Chapter 7 since the Debtor has no ability to propose, confirm or fund a plan of reorganization.

30.     Movants hold secured and unsecured claims against the Debtor in excess of $2.7 million.

31.	Movants' secured claim[7] is secured by the 47 Tranquility Property, with the Debtor's net interest in such property to be no more than approximately $750,000. The unsecured claims of the Ackers therefore approach, if not exceed after the costs of liquidation of the Property, $2 million and likely comprise over 85% of the Debtor's total unsecured debt, with the Debtor's other unsecured creditors totaling less than 5 and claims totaling less than $250,000.

32.	The Debtor has no other classes of impaired creditors, as the mortgage on the 47 Tranquility Property must be paid in full from the sale of said property under any plan.

33.	Accordingly, assuming the likely rejection of a Debtor plan by the Ackers, such plan cannot be confirmed under either Sections 1129(a) or (b) of the Bankruptcy Code, as (a) there will be no class of impaired creditors accepting the plan as required under Section 1129(a)(10) nor can the Debtor's plan offer better treatment than Movants' would receive in Chapter 7, where a Chapter 7 trustee will recover significant assets or monies that were allegedly fraudulently transferred by the Debtor and since the Debtor will not prosecute any claims against his family members under a plan. See Bankruptcy Code Section 1129(a)(7)(ii).

34.	Moreover, the Debtor is conflicted from promulgating a plan which will have to provide for the liquidation of all assets up to the amount of all claims in the estate (no less than $3 million), as such plan will have to include the prosecution of the substantial avoidance claims that Movants believe exist against the Debtor's spouse and potentially other family members. Since the Debtor would obviously not be willing to sue his own spouse or family members, compounded by the fact that the Debtor has utterly and intentionally failed to disclose or otherwise account for

---

[7] The Debtor will likely dispute the secured classification of Movant's claim related to the Judgment as having been recorded 89 days before the Petition Date. However, the Judgment lien is unavoidable in that Movants' have a complete defense to any preference claim as any recovery on the Judgment lien will NOT result in a greater distribution to Movants than in Chapter 7 due to the number and amount of avoidable transfers the trustee will be able to pursue in Chapter 7. See Bankruptcy Code Section 547(b)(5)(A). In any event, the Debtor has failed to bring any action seeking relief as to the Judgment, deeming it an allowed secured claim in the Chapter 11 case.

any transfers of property over the 6 year pre-petition look back period, he will not be able to propose a plan in good faith. See Bankruptcy Code Section 1129(a)(3). As a result of this unresolvable conflict, the Debtor is not a suitable fiduciary for, inter alia, purposes of confirmation and effectuation of a plan. Instead, an independent fiduciary would be required to prosecute such causes of action.

35.     It is further submitted that a Chapter 11 plan, even one that provides for  an independent trustee, is simply not appropriate under the circumstances of the Debtor's case. The Debtor is self-admittedly "Completely disabled" and retired. He has no homestead or non-exempt assets subject to liens that require restructuring or are not otherwise required to be liquidated under a plan to satisfy the best interests test. Chapter 11 is simply not intended to protect this type of debtor. Instead, other parties should be entitled to maximize their return in Chapter 7, where an independent trustee can discover and prosecute for undisclosed assets, avoidable insider transactions and/or transfers while expeditiously liquidating the 47 Tranquility Property without further delay or obfuscation.

36.     Since a plan (absent appointment of an independent fiduciary thereunder) cannot be proposed by the Debtor in good faith due to the conflict described above, and, in any event since the Debtor's plan cannot be confirmed over the anticipated objection of Movants, conversion of the case is appropriate pursuant to, inter alia, Bankruptcy Code Section 1112(b)(2)(A).

37.     From the facts stated above, it is incontrovertible that the Debtor has continued to demonstrate his inability to act as a fiduciary, or interest in paying the Judgment and investigating numerous estate causes of action that appear to exist. It has been glaringly apparent starting with the numerous omissions and inconsistencies in the Debtor's disclosures of his assets, and the

continued lack of disclosure and ability to marshal or preserve assets that this case should once and for all be converted to Chapter 7 immediately to protect this estate from further harm.

## IV. ARGUMENT

### A. Cause Continues to Exist to Convert this Case to Chapter 7

38.     The Movants are a party in interest and, therefore, "ha[ve] standing to request the conversion from Chapter 11 to Chapter 7 pursuant to [Section] 1112(b)." *In re Johnston*, 149 B.R. 158, 161 (B.A.P. 9th Cir. 1992). *See In re E. Coast Airways, Ltd.*, 146 B.R. 325, 335 (Bankr. E.D.N.Y. 1992) (a creditor with only a disputed claim against the Chapter 11 estate has standing to bring a motion to convert pursuant to 11 U.S.C. § 1112(b)).

39.     Section 1112(b)(1) of the Bankruptcy Code provides, in pertinent part, that the Court shall convert or dismiss a case if the movant establishes cause, unless the court determines that unusual circumstances exist such that conversion or dismissal would not be in the best interests of creditors and the estate.[8] Indeed, upon a showing of "cause", the Debtor's case must be converted unless the court makes specific findings that unusual circumstances "establish that the requested conversion is not in the best interests of the creditors and the estate." *Id.*

40.     Section 1112(b)(4), in turn, provides a non-exhaustive list of what constitutes cause. *See In re C-TC 9th Ave. P'ship*, 113 F.3d 1304, 1311 (2d Cir. 1997) ("It is important to note that this list is illustrative, not exhaustive.") (quoting the statute's legislative history stating that "'the list [contained in § 1112(b)] is not exhaustive. The Court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases.' House Report No. 95–595, 95th Cong., 1st Sess. at 405–6, U.S. Code Cong. & Admin.News 1978,

---

[8] 11 U.S.C. § 1112(b)(1); and see, *In re Gateway Access Solutions, Inc.*, 374 B.R. 556, 560 (Bankr. M.D. Pa. 2007) (noting the statutory language change "from permissive to mandatory" and finding cause existed to convert the debtor's cases where the value in the estate was diminishing rapidly at the expense of creditors as extensive administrative costs from professional fees were accumulating while the case lingered in Chapter 11).

pp. 5787, 6363–64"). "Accordingly, courts have also determined that conversion or dismissal of a Chapter 11 case is warranted for other reasons." *In re Babayoff*, 445 B.R. 64, 76 (Bankr. E.D.N.Y. 2011).

41.     Once the court determines that cause has been shown, it "has no choice, and no discretion, and must dismiss or convert the Chapter 11 case." *Lynch v. Barnard*, 590 B.R. 30, 36 (E.D.N.Y. 2018), aff'd sub nom. *In re Lynch*, 795 Fed. Appx. 57 (2d Cir. 2020) (internal citations omitted). "Once a party establishes cause, a court must examine whether dismissal or conversion of a case under chapter 7 is in the best interests of the creditors and the estate." *In re BH S & B Holdings*, LLC, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010).

42.     Therefore, "[t]he Court will apply a two-step analysis in determining whether to dismiss or convert this case. First, it will consider whether "cause" exists for relief under the statute. If it does, the Court will determine whether dismissal or conversion of the case is in the best interest of the creditors and the estate." *In re Kuvykin*, 18-10760 (JLG), 2019 WL 989414, at *5 (Bankr. S.D.N.Y. Feb. 26, 2019) (quotations omitted).

43.     Here, cause *continues to exist* to convert the Debtor's Chapter 11 Case to Chapter 7 because, based on, inter alia, the facts asserted above: (a) the Debtor has already been found by a court of competent jurisdiction to have been an incompetent fiduciary; (b) the Debtor has continued to display a complete inability to account for his assets, liabilities, and financial affairs; (c) the Debtor is administratively insolvent; (d) the Debtor has failed to protect and preserve the Debtors estate by virtue of loss of counsel in the Florida actions and a continuing inability to sell the 47 Tranquility Property; (e) the Debtor is incapable of reorganization nor has the need to; (f) the Debtor cannot confirm a plan without the Movants' consent, and (g) an independent fiduciary

is needed to investigate all of the Debtor's pre-petition transactions and potential avoidable transfers.

44.     There is cause under §1112(b)(4)(A) if there is both (i) substantial or continuing loss to or diminution of the estate and (ii) absence of a reasonable likelihood of rehabilitation. *See In re AdBrite Corp.*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003). The two prongs for establishing cause to convert under §1112(b)(4)(A) are present here.

45.     On the first prong, the section refers to either "substantial" or "continuing" in the disjunctive. Accordingly, when discussing whether there is substantial or continuing loss to or diminution of the estate, "[t]here need not be a significant diminution in the estate to satisfy Section 1112(b)[1]." *In re East Coast Airways, Ltd.*, 146 B.R. 325, 336 (Bankr.E.D.N.Y.1992); *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988)("All that need be found is that the estate is suffering some diminution in value."); *Loop Corp. v. U.S. Tr.*, 379 F.3d 511, 516 (8th Cir. 2004)("In the context of a debtor who has ceased business operations and liquidated virtually all of its assets, any negative cash flow-including that resulting only from administrative expenses-effectively comes straight from the pockets of the creditors. This is enough to satisfy the first element of §1112(b)(1)."); *In re Rundlett*, 136 B.R. 376, 380 (Bankr. S.D.N.Y. 1992). ("In the context of [a debtor living at the expense of the creditors], every dollar expended by the debtor from the [funds that are property of the estate] thereby reduces and diminishes the property of the estate.") *In re AdBrite Corp.*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003)("Obviously, if the debtor has negative cash flow after entry of the order for relief in the chapter 11 case, the elements of § 1112(b)(1) are satisfied") (citation omitted).

46.     Here, the Debtor is not operating any business, is unable to pay his ongoing financial obligations, and is not generating any substantial income, yet continues to incur

substantial administrative expenses in, inter alia, professional fees.[9] See *In re Sillerman*, 605 B.R. 631 (Bankr. S.D.N.Y. 2019)(cause existed under Section 1112(b)(4)(A) to convert Chapter 11 case to Chapter 7, where value of debtor's real estate holdings had declined due in part to debtor's delay in seeking to sell those assets, debtor had described his pending modified plan as a liquidating plan, and debtor had failed to, inter alia, timely make required disclosures).

47.     The costs of administering and winding up an estate are factored into the § 1112(b)(4)(A) loss analysis. *See In re Brutsche*, 476 B.R. 298, 305 (Bankr. D.N.M. 2012) ("professional services come at a cost, obviously, which cost needs to be factored in the calculation of gains and losses for the estate. And the hard fact is that these costs are rapidly mounting expenses for the estate that help put the estate in the position of continuing substantial losses"); *In re Gateway Access Sols., Inc.*, 374 B.R. 556, 564 (Bankr. M.D. Pa. 2007) (evidence of "extensive administrative costs from professional fees that [were] accumulating" supported a finding of "substantial and continuing diminution of the estate"). Surely, a Chapter 7 trustee would administer this case at less expense, and with greater transparency and efficiency.

48.     The second part of § 1112(b)(4)(A) also is easily met here, because rehabilitation of the Debtor is neither envisioned nor possible.

---

[9] In addition, the Debtor has no income to pay for the continuing expenses being incurred in connection with real estate owned at 47 Tranquility Road, Suffern, New York 10901.

49.     The concept of rehabilitation under § 1112(b)(4)(A) is interpreted as follows:

Rehabilitation of the debtor's estate, as that term is used in § 1112(b)(1), is not synonymous with reorganization as that term is used in Chapter 11. Collier on Bankruptcy explains the distinction between the terms:

"Rehabilitate" has been defined to mean "to put back in good condition; re-establish on a firm, sound basis." Rehabilitation, as used in section 1112(b)(1), does not mean the same thing as reorganization, as such term is used in chapter 11. Since a debtor can be liquidated in chapter 11, the ability to confirm a plan of reorganization is considerably different than reaching a firm, sound financial base.

Collier on Bankruptcy, ¶ 1112.03[i], p. 1112–15 (footnotes omitted). The distinction is significant. Rehabilitation of a debtor's estate implies the re-establishment of a sound financial basis, a concept which necessarily involves establishing a cash flow from which current obligations can be met. Reorganization, on the other hand, can involve simple liquidation and distribution of assets.

*In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988). *See In re Rundlett*, 136 B.R. 376, 380

(Bankr. S.D.N.Y. 1992) ("[r]ehabilitation does not mean the same thing as reorganization

for purposes of Chapter 11 because a reorganization may include a complete liquidation");

*In re AdBrite Corp.*, 290 B.R. 209, 216 (Bankr. S.D.N.Y. 2003) (rehabilitation "signifies

that the debtor will be reestablished on a secured financial basis, which implies establishing

a cash flow from which its current obligations can be met"); *In re Herb Philipson's Army*,

18-61376 (DD), 2019 WL 11031654, at *7 (Bankr. N.D.N.Y. Dec. 19, 2019)

("rehabilitation is a different and much more demanding standard than reorganization").

50.     Here, the Debtor has no likelihood of rehabilitation because he has no business to

rehabilitate, has little to no income, has no property which he needs to retain subject to liabilities

he needs to restructure and has already indicated a desire to liquidate. Indeed, at the 341(a)

Meeting, the Debtor stated the purpose of filing for bankruptcy was to "Put it behind me. I don't

know. I mean, it's -- the debt is the main issue –". (See Exhibit D, page 22). Additionally, the

Debtor testified that his only sources of income are $716 every two weeks in workers

compensation and social security disability. (See Exhibit D, page 15). **There is nothing in the Debtor's estate to reorganize.**

### B. The Debtor Has Already Been Found by a Court of Competent Jurisdiction to Have Been an Incompetent Fiduciary

51.    As explained previously, the Debtor has been found to have been an incompetent fiduciary during the Estate and 1987 Trust litigations by the Florida Court.

52.    In the attached Judgment (Exhibit "B") the Florida Court stated "[The Debtor] acted in contravention of his fiduciary duties by: (a) litigating and advancing claims that were released in the 2010 SA, both in and out of Court; (b) supporting Arlene Acker and her counsel in the Accounting Action by appearing in person in that Action over at least a five (5) year period as a party, regularly taking positions in opposition to the Estate's legal position; (c) providing her counsel and the New York court with privileged and confidential Estate-related financial information; (d) providing inaccurate and/or misleading information regarding the Estate's financial status to the New York court, leading to an Order requiring that the Marital Trust be funded immediately and subsequently reversed on appeal; (e) instituting litigation, including the Declaratory Action filed in Florida, as to matters that were specifically released as a part of the 2010 SA or that lacked merit; (f) interfered with and thwarted the pending IRS audit, raising claims that he had specifically released, including actions that might have caused imposition of taxes or penalties that might not otherwise have been imposed on the Estate; and (g) repeatedly attempted to improperly remove the Court-appointed third-party co-fiduciary." (See Exhibit B).

53.    The Florida Court further stated in the Judgment "[The Debtor] simultaneously (a) re-litigated matters and issues that he had released, (b) maintained a position in violation of the 2010 SA and adverse to the Estate in the Accounting Action and (c) demanded that the Marital Trust be funded immediately, while making claims of IRS tax fraud by the Estate. Further, after

executing the 2010 SA and release, [the Debtor] had unilateral, intentional and substantial interference with the IRS regarding the pending audit in violation of the 2010 SA." *Id*.

54.     And now that the Florida actions are going forward on a multitude of critical motions, the Debtor has no counsel to represent him or protect or preserve his bankrupt estate's interests.

55.     Such findings clearly demonstrate the Debtor's continuing inability to be a fiduciary, and as such the Debtor should not be left as its own statutory trustee. See *In re Strawbridge*, 2010 WL 779267 (Bankr. S.D.N.Y. 2010)(case converted to Chapter 7 based largely on debtor's lack of good faith in filing under Chapter 11 and the debtor's mismanagement of the estate).

## C. The Debtor has Demonstrated a Complete Inability to Account for His Assets, Liabilities, and Financial Affairs

56.     As outlined extensively both previously and above, the Debtor has made at least 13 material omissions or inconsistencies regarding his assets, liabilities, and transfers of property believed to be worth an estimated several million dollars.

57.     Furthermore, when asked about these various omissions and inconsistencies at the 341(a) Meeting, the Debtor was not able to adequately recall or account for a single one of them. Testimony at the Debtor from the 341(a) Meeting further elicits this point:

  a.   When asked about his interest in the SA FLP, the Debtor said "unknown, I cannot answer that", despite evidence to the contrary. (See Exhibit D, Page 26).

  b.   When asked what level of review the Debtor did in preparation of his petition and schedules, the Debtor said "I don't get – it's very difficult" regarding anything related to his late father's Estate or the Martial Trust. (See Exhibit D, Page 27).

c.  When asked how much the Debtor received in pre-petition distributions from the SA FLP, the Debtor replied "Again, I can't answer that off the top of my head. I'm sorry." (See Exhibit D, Page 28).

d.  When asked about his interest in the Revocable Inter Vivos Stanley Acker Settlor Trust, the Debtor replied "I still do not have information on that. I'm sorry". (See Exhibit D, Page 33).

e.  When asked if the Debtor ever transferred equity interest in IMA to his wife, the Debtor replied "I don't have an answer to that because the company is hers. I just don't know how it was transferred over." (See Exhibit D, Page 34).

f.  Additionally, when the Debtor was then asked about where the proceeds went for a property sold by IMA in 2021, the Debtor replied, "I have no – I don't know." (See Exhibit D, Page 35).

g.  When asked about when the sale of the Debtor's Porsche took place, which was not mentioned in the Debtor's schedules, the Debtor replied "That I can't tell you off the top of my head. I know it was quite a few years ago." (See Exhibit D, Page 40).

h.  When asked about the sale of jewelry from Elleance and in response to being asked the date of when they were sold, the Debtor replied "Karen and David know the date on that. I'm not sure. They have the records." (See Exhibit D, Page 40).

i.  When asked about receiving property from the Estate and when it was sold, the Debtor replied "No comment. I honestly can't tell you the date on that. All I know is the monies were used to pay bills, whatever was left." (See Exhibit D, Page 42).

j.  When asked about his receiving an IRA from the Estate in 2016, the Debtor replied, "I don't remember 2016, I'm sorry." (See Exhibit D, Page 42).

k. When asked about if the Debtor owes any money to his uncle, Robert Acker, the Debtor replied, "No. I do not." (See Exhibit D, Page 46). This statement is contrary to the Uncle and Movants' position that the Debtor signed and is in default of a promissory note in favor of the Debtor's uncle.

58. In summary of the Debtor's testimony, the Debtor basically failed to recall or remember anything relating to his financials. It is apparent the Debtor has materially failed to disclose all of his assets and liabilities and cannot account for them, and therefore cannot properly administer his own estate.

**D. The Debtor Cannot Confirm a Plan Without Movants' Consent**

59. Movants are the only substantial creditors of the Debtor, and control well over two-thirds in dollar amount of the unsecured creditor claims.

60. Without a consenting class, the Debtor is unable to confirm a plan. *See, e.g. Boston Post Road Ltd. P'ship v. Federal Deposit Ins. Corp. (In re Boston Post Road Ltd. P'ship)*, 21 F.3d 477 (2d Cir. 1994) (confirmation was properly denied for failure to obtain the acceptance of an impaired non-insider class of creditors where debtor tried to gerrymander the voting classes by separately classifying the secured lender's unsecured deficiency claim from other unsecured creditors and where debtor sought to impair claims of holders of security deposits by increasing the interest rate).

61. "Succinctly stated, a plan may not be confirmed unless either (1) it is approved by two-thirds in amount and more than one half in number of each 'impaired' class, 11 U.S.C. § 1126(c), 1129(a)(8); or (2) at least one impaired class approves the plan, § 1129(a)(10), and the debtor fulfills the cramdown requirements of § 1129(b) to enable confirmation notwithstanding

the plan's rejection by one or more impaired classes." *In re 499 W. Warren St. Associates, Ltd. P'ship*, 151 B.R. 307, 310 (Bankr. N.D.N.Y. 1992) (internal quotation marks omitted).

62.     Thus, the Debtor cannot confirm any Plan over Movants' objection.

63.     11 U.S.C. §1112(b) gives the Court and creditors the option to prefer conversion of the case to one under Chapter 7 to dismissal.

64.     In this instance, because of the significant investigation needed to (a) quickly liquidate the 47 Tranquility Property, a wasting asset, and (b) determine the full amount of the Debtor's assets, liabilities, financial affairs, likely avoidable transfers, and substantial avoidance claims, the Movants request conversion to a Chapter 7 as being in the best interests of all creditors.

65.     Furthermore, conversion of this Debtor's Chapter 11 Case to Chapter 7 is more appropriate than dismissal[10] because in a case under this jurisdiction with similar circumstances, this Court found that:

> "Having found cause to convert or dismiss the Debtor's case, the Court further concludes that conversion, rather than dismissal, is in the best interest of the creditors and the estate. In the Debtors Schedule A/B: Assets—Real and Personal Property [ECF No. 17] ("Schedule A/B"), the Debtor lists an account receivable in the amount of $1,045,509. At the Hearing, in response to the Court's question about this receivable, the Debtor's counsel explained that the receivable is owing to the Debtor by its president and sole shareholder, Mr. Friedman. Moreover, a copy of the Debtor's lease agreement with Tunnel Management, an entity in which Mr. Friedman holds a one-third ownership interest (Pisciotta Decl. ¶ 15, Exh. U), has yet to be provided to the Court. In addition, the holders of the Lender Claims, the two largest unsecured claims, with the possible exception of Capital One (depending upon the extent, if any, of Capital One's deficiency claim), are

---

[10] As the Court may be aware, the Debtor has now filed a "hail Mary" bad faith motion to dismiss his Chapter 11 case only after Movants announced in Court at the last hearing that Movants were filing the instant Motion to convert. As will be set forth in Movant's objection to come, the Debtor's motion to dismiss is nothing more than another bad faith litigation tactic of the Debtor which seeks to avoid the consequences of the Debtor's misconduct and fraudulent transfers and to cause further erosion, harm and delay to Movants and the Debtor's other creditors. The Debtor cannot simply jump in and out of bankruptcy for his own convenient and strategic needs. The Debtor has completely abused the bankruptcy system and now, through his motion to dismiss, seeks to force his creditors to further litigate and chase the Debtor in an endless continuation of costly and harmful litigation with no end in sight. Only through conversion can the Debtor's estate and creditors ensure any recovery against the Debtor and avoid further fees, costs, delay and potentially irreparable harm. Movants reserve their rights to seek sanctions, costs and injunctive relief against the Debtor in connection with the motion to dismiss under Bankruptcy Code Section 105 and Bankruptcy Rule 11.

solely owned by Mr. Friedman. A chapter 7 trustee would be best positioned to recover the receivable listed on Schedule A/B upon conversion and to investigate the Lender Claims and the rights and obligations of the Debtor and Tunnel Management under the purported lease agreement between the parties, and thereby maximize the estate's value for the benefit of all creditors. In light of these facts, the Court also finds that equality of distribution would be best ensured by conversion, as opposed to dismissal."

*In re Red Bull Taxi Inc.*, 2017 WL 1753234, at *5 (Bankr. S.D.N.Y. May 3, 2017).

66.  In *SWJ Mgmt., LLC v. Coan*, 551 B.R. 93(D. Conn.), the District Court affirmed

the Bankruptcy Court's motion to convert, rather than dismiss, a Chapter 11 case , stating,

"The Code does not define the phrase 'best interests of creditors and the estate.' " 7 Collier on Bankruptcy ¶ 1112.04[7]. As a result, courts have indicated various reasons for choosing conversion and rejecting dismissal. Courts have considered "prejudice to creditors" to be a proper reason for a bankruptcy court's refusal to dismiss a chapter 11 case. See id.; Matter of Atlas Supply Corp., 857 F.2d 1061, 1063 (5th Cir.1988) ("If dismissal would prejudice the creditors, then it will ordinarily be denied."). Misconduct of the debtor, i.e., debtor actions that delay creditors' ability to collect their claims or otherwise protect their interests, also warrants conversion rather than dismissal. See In re Simmons, 200 F.3d 738, 743 (11th Cir.2000) ("When dismissal will only *99 allow the Debtor to hinder creditors, secret[e] assets, and further the Debtor's abuse of the system, dismissal or her voluntary petition is not warranted."); In re Picacho Hills Utility Co., Inc., 518 B.R. 75, 80 (Bankr.N.M.2014) (finding the need for a "neutral, unbiased trustee" to investigate transfers favored conversion rather than dismissal); In re FL. Invest. USA, Inc., No. 13–10814, 2013 WL 4039807, at *5 (Bankr. E.D. Cal. Aug. 7, 2013); see also 7 Collier on Bankruptcy ¶ 1112.04[7] ("In [choosing between conversion and dismissal], the court may consider such factors as ... whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests."). Collier also lists "whether the debtor would simply file a further case upon dismissal" as a reason to convert rather than dismiss. 7 Collier on Bankruptcy ¶ 1112.04[7].

The considerations listed above formed the basis of the bankruptcy court's decision to convert rather than dismiss. In its non-exhaustive list of reasons favoring conversion, the bankruptcy court noted that Management had failed to take steps to reorganize, had made avoidable transfers, and had attempted to employ counsel with actual or potential conflicts of interest."

*Id.,* 551 B.R. at 98-99. See also, *In re Gilbert Broadcasting Corp.*, 54 B.R. 2 (Bankr. D.N.J. 1984)

(interests of all creditors would best be served by conversion, rather than by dismissal of Chapter

11 petition that had not been filed in good faith, in light of pending state court action in which judgment creditor sought to enforce his judgment and the underlying bankruptcy principle of equality of distribution).

67.     These cases are exactly on point with this Chapter 11 case that has clearly not been prosecuted in good faith. Dismissal will only result in further cost, litigation "chaos" delay with no hope for creditor recovery, whereas a Chapter 7 trustee will effectively liquidate all assets (like 47 Tranquility), investigate the Debtor's affairs, *objectively* review all filed claims and prosecute the likely millions of dollars in claims arising from the Debtor's series of omissions of disclosure and/or fraudulent conveyances made over the last 6 years. For these reasons, in addition to the others set forth in this Motion, Dismissal is therefore *not* in the best interests of the creditors and the estate, whereas Chapter 7 clearly is.

**E. An Independent Fiduciary is Needed to Investigate Millions of Potentially Avoidable Transactions Committed by the Debtor**

68.     As stated above and as learned in the Debtor's testimony at the 341(a) Meeting, there are potentially millions of avoidable transactions made by the Debtor that require investigation by an independent third party.

69.     These avoidable transactions include but are not limited to:

a.     The transfer of any distribution the Debtor received from SA FLP and the 1987 Trust;

b.     The transfer of the Debtor's interest in IMA and MSA to his spouse;

c.     The sale of the Debtor's Porsche 911;

d.     The sale of real estate at 3 Orchard Lane;

e.     The sale of jewelry identified as Elleance and status of its whereabouts;

f.      The Debtor's interest in Galaxy Fine Arts and status of its property; and

g. The Debtor's gun collection, Elephant Tusk and WWII memorabilia.

70. From the Debtor's testimony at the 341(a) Meeting, the Debtor has made it clear he cannot remember or account for the transfer or status of any of these assets above.

71. In sum, the Debtor has demonstrated time and time again throughout this Chapter 11 case that, inter alia, he cannot act as a qualified fiduciary for his creditors and has demonstrated he is in breach of these duties, and therefore a Chapter 7 Trustee is a proper party to evaluate these claims in a neutral, independent matter, and if necessary, can prosecute avoidance actions and objectively administer the Debtor's estate to ensure the creditors receive a maximum distribution from the estate.

## V. NOTICE OF MOTION

72. The Movants intend to serve all creditors and parties in interest, the Debtor and counsel for the Debtor file (i) first class mail; and (ii) by Electronic Filing and electronic mail to each person receiving electronic notices and that filed a notice of appearance in this case.

73. The Movants submit that the relief requested is reasonable and proper and *now more than ever* in the best interest of creditors.

**WHEREFORE,** The Movants request that this Motion be granted, and the Court enter an order immediately converting the Chapter 11 Case to Chapter 7, with such other and further relief as this Court deems just and proper.

Dated: White Plains, New York
      February 14, 2023

                DAVIDOFF HUTCHER & CITRON LLP


                By: _/s/ Jonathan S. Pasternak_
                    Jonathan S. Pasternak
                120 Bloomingdale Road
                White Plains, New York 10605
                (914) 381-7400
                jsp@dhclegal.com

                *Attorneys for David & Karen Acker*