KIRBY AISNER & CURLEY LLP  
*Attorneys for the Debtor*  
700 White Plains Road, Suite 237  
Scarsdale, New York 10583  
(914) 401-9500  
Julie Cvek Curley, Esq.  
jcurley@kacllp.com

Hearing Date: *March 7, 2023*
Hearing Time: *10:00 a.m.*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
In re:

MARK STEVEN ACKER,

                     Debtor.
-----------------------------------------------------------X

Chapter 11
Case No. 22-22359 (SHL)

# AMENDED
# DECLARATION OF DEBTOR MARK STEVEN ACKER IN
# SUPPORT OF HIS OBJECTION TO THE RENEWED MOTION
# BY DAVID & KAREN ACKER FOR AN ORDER CONVERTING
# THE DEBTOR'S CHAPTER 11 BANKRUPTCY CASE TO A
# CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE

Pursuant to 28 U.S.C. §1746, Mark Steven Acker declares, under penalty of perjury, as follows:

1. I am the debtor and debtor-in-possession in the above-captioned Chapter 11 proceeding (the "**Chapter 11 Case**").

2. The factual statements in this declaration are based on my personal knowledge and information supplied to me by others under my supervision, and if called and sworn as a witness, I could and would testify completely thereto.

3. I submit this declaration in support of my objection (the "**Objection**") to the renewed motion (the "**Motion**") of David Acker ("**David**") and Karen Acker ("**Karen**", together with David, the "**Siblings**"), to convert this Chapter 11 Case to a case under Chapter 7 pursuant to 11 U.S.C. §1112(b).

**INTRODUCTION**

1. My Siblings are using this Chapter 11 Case to continue to harass and litigate with me, for what I can perceive only as an attempt to take everything away from me and destroy me.

2. As the Court will learn from my Declaration, over the past twenty years I have faced one traumatic event after another. What is perhaps the most hurtful is that much of my trauma and stress has been induced by my Siblings. By their actions, vexatious litigation and efforts to mislead this Court, they are seeking to destroy me financially. Now, by their Motion, my Siblings are mischaracterizing and skewing facts to mislead this Court. The Siblings have first-hand knowledge and information to refute much of the allegations in the Motion, yet they choose to mislead the Court with the hopes that they can convince this Court, and then a chapter 7 trustee, of their unfounded and unsubstantiated statements in an effort to have someone other than themselves, fund unnecessary investigations and discovery of the Debtor – all of which could be accomplished outside of this Court if my motion to dismiss is granted.

**BACKGROUND**

4. My father, Stanley Acker, and I founded Pavion Ltd ("**Pavion**") which developed the Wet n' Wild line of value cosmetics, which grew from a four-employee company run from our house in New City, New York to having over 630 employees, full national retail distribution and distribution to more than 47 international countries.

5. I worked more than 60 hours per week on average, until 1997 when we sold Pavion for more than $100 million. At the time Pavion was sold, myself and each of my Siblings were 20% shareholders and we each received approximately $15 million from the sale.

6. Following the sale of Pavion, I used some of my portion of the sale proceeds to purchase 47 Tranquility Road, Suffern, New York ("**47 Tranquility**") and to fund various new business ventures.

7. After the sale of Pavion, my father decided to slow down and retire. In 1997, I formed MSA Consulting Corporation ("**MSA**"), which at its inception, managed my father's real estate investments and various businesses. MSA managed my father's businesses for over ten years, until 2010 when the continued Estate Litigation made it impossible to continue. The financial compensation to MSA from my father was inclusion of my family on the health insurance policy and payment of the plan premium. MSA never made and profits and reported losses on its tax returns each year. In 2002, I used MSA to pursue a startup cosmetic company – a celebrity branded cosmetic line. I trademarked a brand and met with numerous celebrities in New York and Los Angeles to propose my business plan, but unfortunately after my health complications arose, I could not devote the time and energy this endeavor needed. From time to time, I used MSA when I was pursuing various business endeavors so I could more easily keep track of business related income and expenses, versus personal expenses.

8. In 1998, I formed IMA Construction Corporation ("**IMA**") which was a construction company that would partner in real estate development projects. In 2000, IMA purchased 50 Tranquility Road, Suffern, New York - the house across the street from 47 Tranquility. My family lived at 50 Tranquility while we renovated and improved 47 Tranquility.

9. Another endeavor I pursued after the sale of Pavion was opening a Star Trek themed museum. As a self-proclaimed Trekkie, in 2001 I formed Galaxy Fine Arts, Inc. ("**Galaxy**") which was supposed to open a Star Trek themed museum displaying various memorabilia and offering the opportunity for other Trekkies to meet Star Trek cast members. I

spent the first year buying memorabilia, attending conventions, and meeting actors to have them initially sign the memorabilia and then establishing a relationship so they could be approached for making appearances at the museum. I was never able to open the museum.

10. The following year, in 2002, during a routine body scan a large tumor the size of a grapefruit was found in my chest. A biopsy revealed that the tumor was B-cell non-Hodgkin lymphoma (NHL). While the usual course of treatment for NHL was chemotherapy, because of the size and location of the tumor, which was extremely rare, I required surgery to remove the tumor. I underwent an extensive surgery where my chest wall was broken open to remove the tumor and my lymph nodes, as well as the surrounding tissue and organs in order to obtain clean margins. This included removing my pericardium (the membrane that encloses my heart) and removing a lobe from my lung. Following the surgery, I recovered at Columbia Presbyterian Hospital in New York City for several weeks, and after my discharge, I received one year of chemotherapy treatments. Following my last round of chemotherapy, I underwent routine PET scans to monitor any new cancer growth, initially every 3 months, then every 6 months.

11. During my cancer struggle, my wife, Rochelle Acker ("**Rochelle**"), took over the management and operations of my various businesses – MSA, IMA, and Galaxy – as well as managing our household (at the time we had 3 children between 10 to 17 years of age). Rochelle, together with my father who was alive at the time, and MSA's secretary and bookkeeper, worked together to manage all of the various businesses while I was hospitalized and thereafter undergoing treatment.

12. Unfortunately, my cancer diagnosis and the treatment had a significant impact on my businesses. In 2002, IMA ended all of its relationships and projects, with IMA's assets being liquidated (except 50 Tranquility) then distributed to me, the sole shareholder, to pay our family's

expenses since I was not working and we did not have any other income. After 2002, Galaxy ceased operations and never did anything more to open a museum.  In 2004 when I was in remission from my NHL diagnosis, I transferred my interest in MSA, IMA, and Galaxy to my wife. At the time, MSA did not have any assets or business operations, IMA had no assets and ceased operations, and Galaxy had no operations, and its only assets were the Star Trek Memorabilia.

13. On March 6, 2008 my father passed away and left a Last Will and Testament dated March 2, 2008 (the "**Will**") and an Amended an Restated Revocable Intervivos Stanley Acker Settlor Trust Agreement dated March 2, 2008 (the "**Trust**"). Myself and my Siblings are the Co-Personal Representatives of the Estate of Stanley Acker, our father (the "**Estate**"). It was subsequently found out that my Siblings went to Florida while my father was in the ICU and had him sign a new will and testament 6 days before he died.

14. I have been engaged in litigation with my Siblings related to our father's estate, including but not limited to: (a) the Stanley Acker Family Limited Partnership (the "**SA FLP**"); (b) the Stanley Acker Revocable Trust (the "**Estate/Trust**");  (c) the Irrevocable Life Insurance Trust, Stanley Acker, Grantor dated October 1, 1987 (the "**1987 Trust**"); and (d) the Marital Trust (for the lifetime beneficiary Arlene Acker) (the "**Marital Trust**", together with the SA FLP, Estate/Trust, and 1987 Trust, where applicable, the "**SA Trusts and Estate**"). Throughout the administration of the SA Trusts and Estate, I have been involved in litigation with my Siblings pending in the Fifteenth Judicial Circuit in and for Palm Beach County, Florida (the "**Florida Court**"): (i) *In re: Matter of the Irrevocable Life Insurance Trust, Stanley Acker, Grantor, Dated October 1, 1987,* Case No. 50 2014 CP 04382 XXXX SB (the "**Trust Litigation**"), and (ii) *In*

*re: The Estate of Stanley Acker,* Case No. 50 2008 CP 001929 XXXX SB (the "**Estate Litigation**", and together with the Trust Litigation, the "**Florida State Court Actions**").

15. Approximately the same time of my father's passing, a follow up PET scan revealed that I had cancer again; this time I was diagnosed with thyroid cancer. The treatment once again involved surgery to remove the tumor and between 2008 and 2009 I underwent a rounds of radiation treatment.

16. After my treatment concluded, in 2009 I resumed working part-time for the South Nyack/Grandview Police Department and Rockland Sheriff's Department, where I had worked part-time since 1990. This part-time work, together with the administration and litigation related to my father's Estate, consumed all of my time, energy and money.

17. During the trial in 2019 in the Estate Litigation, I unfortunately suffered another medical setback. On May 19, 2019, while I was on duty with the Rockland Sheriff's Office, where I worked as a motorcycle instructor, the motorcycle I was operating had a malfunction while going approximately 50 mph causing it to crash, the crash nearly killed me, and I had severe and debilitating injuries. I broke my neck and back in many locations, and my left hand was nearly severed from my wrist and was thankfully able to be reattached. I was hospitalized for several months, and thereafter I received several months of in-patient rehabilitation. I have had 8 surgeries since this accident between 2019 through 2021. My last surgery in 2021 was my biggest and longest surgery. The surgery, which was 12 hours long, placed 2 pins per vertebrae with titanium posts in my back from my skull to just above my tailbone in order to keep my spine straight.

18. While I was still recovering from this accident, the trial (which should not have continued at that time due to my injuries) in the Estate Litigation resumed on November 4, 5, and

6, 2019, which resulted in a judgment in the amount of $960,000 (the "**Judgment**") being entered against me. I was unable to effectively participate in trial and it should not have proceeded at that time because I was still recovery from my injuries from my accident. However, the Judgment is now final and non-appealable and I do not dispute it.

19. On June 15, 2022, I filed this Chapter 11 Case so that I could have a break from the incessant litigation of my Siblings. Instead, my Siblings instead use this Chapter 11 Case as just another forum to litigate and fight with me. A mere forty-five (45) days after I filed this Chapter 11 Case, my Siblings filed their first motion to convert this Chapter 11 Case to a chapter 7 case. Now my Siblings have filed their renewed Motion, without any new bases to support their request, except that several months has passed since the hearing on the prior motion, during which period my Siblings and I agreed to "put down our pens" as we worked toward a settlement.

20. To that point, paragraph 20 in both motions (which is 7 pages long), which purports to set forth the Debtor's inconsistencies and omissions in his petition and schedules is identical. Addressing those points:

| ¶20(a) *The Stanley Acker Intervivos Trust* Siblings allege that I failed to identify a value. | It is impossible to quantify the value of my interest in this asset, as set forth in my Siblings motion. While there is currently a bank balance reflecting the value of that assets, as my Siblings admit in their motion, I am a "one third beneficiary of anything left in the Estate after the Movants finish the ongoing litigation and administration of the Estate". *See,* ¶14(a) By my Siblings own reasoning, it is not possible to place an exact dollar amount on this asset. |
|---|---|
| ¶20(b) *The Marital Trust* Siblings allege that I failed to disclose this asset. | This asset has not been concealed by me. In fact, in my motion to dismiss my case, I bring this asset to light. The amendment to my Schedules was not made because my Siblings and I had agreed to put down our pens and I |

| | |
|---|---|
| | did not want any filings to derail my settlement efforts. |
| ¶20(c) *The 1987 Trust*<br>Siblings allege that I failed to disclose this asset. | Similar to the Stanley Acker Intervivos Trust, it is impossible to quantify the value of my interest in this asset. As my Siblings state in their motion, they believe that there is ongoing litigation. If the Florida Court grants their request (which has already been denied with prejudice) then it is possible that would reduce the value of my interest in this asset (currently valued at $25,000 – 1/3 of approx. $75,000 bank balance reported). |
| ¶20(d) *The Stanley Acker Family Ltd Pshp*<br>Siblings allege that I failed to disclose this asset. | This asset has not been concealed by me. As state by my Siblings, there are no longer any assets of this entity. The amendment to my Schedules to nonetheless include this was not made because my Siblings and I had agreed to put down our pens and I did not want any filings to derail my settlement efforts. |
| ¶20(e) *Orchard Lane Property*<br>Siblings allege that I failed to disclose this asset. | This property was initially owned by the Stanley Acker Family Ltd Pshp. My Siblings continually took the position in the Florida Courts that this property had no value, so the Judge had ordered that the title be transferred to me. After the property was transferred to me on or about 8/21/2020, I listed it for sale and sold it on 1/19/2021. This was not listed on my Schedule A/B because it was not an asset on the day I filed for bankruptcy and it was not listed on my SOFA because I thought it was sold more than 2 years before the Petition Date. My attorney reviewed the Rockland County land records and confirmed the date of the transfer. Most of the proceeds from the sale of this property were used to satisfy the Judgment of Solomon Appeals against me which was a lien on that property. The amendment to my SOFA was not made because my Siblings and I had agreed to put down our pens and I did not want any filings to derail my settlement efforts. |
| ¶20(f) *The Shirley Acker Irrevocable Trust* | This asset has not been concealed by me. As state by my Siblings, there are no longer any |

| | |
|---|---|
| Siblings allege that I failed to disclose this asset. | assets of this entity. The amendment to my Schedules to nonetheless include this was not made because my Siblings and I had agreed to put down our pens and I did not want any filings to derail my settlement efforts. |
| ¶20(g) *The 1993 Trust* <br> Siblings allege that I failed to disclose a liability to my Uncle Bob. | While I was undergoing my cancer treatment in 2008, Karen made a promise to our Uncle Bob that he would receive $100,000. Karen realized that she had made a mistake with the financials, and called a meeting with myself and David and asked us to pay Uncle Bob from our personal funds. The terms of the promissory note were that if I receive 1/3 of the sale price of my father's home (which should have sold for $9 Million) then I would pay Uncle Bob $18,000. However, when my father's home was sold, I did not receive any money, so the terms of the agreement were not met and I did not have to pay him anything. Karen and David then took the promissory note with Uncle Bob and they modified it by copy and pasting their own language on it. |
| ¶20(h) *MSA Consulting Corporation ("MSA")* <br> Siblings allege that I failed to disclose this asset. | MSA was formed in 1997 after Pavion was sold. Initially, MSA was a consulting company and managed by father's various businesses. In 2002, it expanded to start a celebrity branded cosmetic line, which unfortunately never came to fruition. During the treatment of my first cancer diagnosis in 2002, my wife Rochelle took over its management and operations, and it eventually ceased operations. In 2004, I formally transferred my shares to Rochelle. The tax returns showed losses every year. MSA has little to no assets. |
| ¶20(i) *Omitted Litigation* <br> Siblings allege that I failed to disclose this asset. | The amendment to my Schedules was not made because my Siblings and I had agreed to put down our pens and I did not want any filings to derail my settlement efforts. |
| ¶20(j) *IMA Construction Corporation ("IMA")* <br> Siblings allege that I failed to disclose this asset. | IMA is a construction company that engaged in joint construction development. It was a successful venture until 2002, at which time it |

9

| | |
|---|---|
| | ceased operations and all contracts and relationship ended because I was incapacitated. During the treatment of my first cancer diagnosis in 2002, my wife Rochelle took over its management and operations, and it eventually ceased operations. In 2004, I formally transferred my shares to Rochelle. |
| ¶20(k) *Galaxy Fine Arts, Inc. ("Galaxy")* Siblings allege that I failed to disclose this asset. | Galaxy was formed in 2001 with a business purpose to open a museum to display Star Trek memorabilia. To that end, I invested my personal funds to purchase memorabilia, attend conventions, and meet actors. I invested approximately $200-250,000 to purchase Galaxy's assets. Galaxy had an insurance policy which insured its assets for $200-250,000, more than its actual value to cover any losses. My Siblings fail to provide any backup for the $1.5M valuation they supposedly rely upon. |
| ¶20(l) *WWII Collection* Siblings allege that I failed to disclose this asset. | The WWII Collection was bequethed to me in my father's Will. After my second cancer diagnosis in 2008, Karen took over administration of our father's Estate and she kept the small briefcase with my father's WWII Collection for 8 years. I was not aware of, nor have I been provided with anything regarding the $150,000 valuation stated by my Siblings and I am certainly not aware of or have any recollection of any of my friends making a valuation. |
| ¶20(m) *Elleance Jewelry* Siblings allege that I failed to disclose this asset. | My father's Elleance Jewelery collection was bequeathed to me and my Siblings. When I finally received my part of the collection, in or about 2019, I immediately sold the jewelry and received approximately $17,000. This was not listed because it is not responsive to any of the questions or disclosures required in my Schedules of Statement of Financial Affairs as it is not a current asset and falls outside the time frame of pre-petition transactions. |

10

| | |
|---|---|
| ¶20(n) *Omitted Automobile*<br>Siblings allege that I failed to disclose this asset. | The Porsche 911 was not listed because it is not responsive to any of the questions or disclosures required in my Schedules of Statement of Financial Affairs as it is not a current asset and falls outside the time frame of pre-petition transactions. The car was sold at an arms' length transaction to a third party. My son assisted with the sale and the monies were used to pay bills. |
| ¶20(o) *Elephant Trunk*<br>Siblings allege that I failed to disclose this asset. | My father's Elephant Tusk was bequeathed to me in his Will. It currently has no value and it cannot be sold. My father acquired and imported the tusk before there was a ban on ivory. It is now illegal to import ivory tusks. Without the purchase receipt showing where it was purchased and the year it purchased to authenticate that it is not illegal, I cannot sell it. I believe Karen has this paperwork, but she refuses to provide it to me, so there is no value for this asset. I am not aware of, nor have I been provided with anything regarding the $150,000 valuation or $60,000 insurance policy |

21. As explained in detail above, my Siblings attempt to portray me concealing assets and making omissions is unfounded and self-serving.

22. Their argument that I've failed to properly administer my Chapter 11 Case, caused administrative insolvency, and jeopardized the value of my assets and cause dealy and harm to my creditors, all of which my Siblings assert are cause to convert my Chapter 11 Case to a chapter 7 case is unsupported and wholly conclusory. In the Motion, my Siblings do not articulate what actions (or inactions) I have taken that constitute a failure to administer my case. In the Motion, my Siblings do not articulate the basis for their conclusion that my estate is administratively insolvent. Without any facts to support these statements, they cannot be taken at face value and I submit that cause does not exist to convert this Chapter 11 Case to a chapter 7 case.

23. Further in the Motion, my Siblings argue that I am incapable of protecting my interests in my father's Estate because the attorney I used prior to this Chapter 11 Case withdrew as counsel. I did not seek to retain this attorney post-petition and did not oppose the withdrawal because of a conflict. This attorney purported to be a creditor and for that reason had interests that were adverse to me resulting in a conflict and could not be retained. However, my Siblings are trying to spin this against me saying that I am incapable of protecting my interests in my father's Estate. Rather, they are trying to use this as a reason to stop me from my ability to protect my interests in my father's Estate so that they could steamroll me and take my inheritance from me and keep it for themselves instead.

24. My Siblings further try to argue that their inflated claim is allowed, merely because I have not yet filed an objection to it. There is no deadline that has been set yet whereby an objection to a claim can be filed, so an objection to their inflated claim can still be raised.

25. My Siblings filed a bogus $2.61 million proof of claim (the "**Siblings Claim**"), somehow fabricating $1.65 million in new claims against me. The addendum to the Siblings Claim computes the claim amount as follows:

| Judgment | $960,000 |
| Attorneys' Fees in Relation to the Judgment | $650,000 |
| Damages and legal fees related to the 1987 Trust | $400,000 |
| Misappropriated funds from the 1987 Trust | $600,000 |
| Total: | $2,610,000 |

26. Other than the Judgment, none of the other claims or amounts in the Siblings Claim have been awarded in the Florida State Court Actions.

27. The Siblings Claim against me for "Misappropriated funds from the 1987 Trust" was already dismissed <u>with prejudice</u> by the Florida Court in the Trust Litigation. Accordingly, there is no basis for "Damages and legal fees related to the 1987 Trust" portion of the Siblings

Claim. These two items alone inflate the Siblings Claim by $1 million.

28. Further, there has been no allowance to the Siblings for the $650,000 for "Attorneys' Fees in Relation to the Judgment" and there has been nothing produced to support that absurd amount this portion of the claim refers the charging lien of the Siblings' attorneys (the Markarian Team), this lien is against the Siblings only, not me.

29. I have been in litigation for nearly fifteen (15) years with my Siblings, which resulted in the Judgment that my Siblings inappropriately filed as a lien on 47 Tranquility. I filed for bankruptcy with the hope reaching a settlement.

30. I have come to accept the unfortunate reality that no settlement offer or Plan will ever satisfy my Siblings. To spend more money pursuing that option would be a fool's errand. The Estate Litigation must be adjudicated to conclusion.

31. While the Estate Litigation may be expensive, the alternative of fighting with my Siblings in this Chapter 11 Case *and* the Estate Litigation is even more expensive.

32. My Siblings aim to convert this Chapter 11 Case to a chapter 7 case and have a bankruptcy trustee conduct unnecessary in-depth discovery into my finances and that of my family members. Additionally, it doesn't make sense to saddle a bankruptcy trustee with analyzing my Siblings' claims in the Estate Litigation, and potentially litigating those claims to conclusion. It's my Siblings who should bear those costs and risks of losing the Estate Litigation.

33. All of these claims can be adjudicated under state law and would result in substantially the same relief as would result in bankruptcy court. Since the bankruptcy purpose of a case no longer exists, my Siblings as creditors should not be permitted to prolong or sustain my case merely to take advantage of benefits bankruptcy offers to creditors. Thus, I respectfully submit that the Motion to convert this Chapter 11 Case be denied and instead the case be

dismissed.

## CONCLUSION

34. Based upon the foregoing, it is respectfully requested that the Motion be denied, together with such other and further request as this Court deems appropriate.

Dated: Haverstraw, New York
       February 28, 2023

*/s/ Mark Steven Acker*
Mark Steven Acker